PER CURIAM.
We have for review a referee’s report regarding alleged ethical breaches by David S. Shankman. We have jurisdiction. See art. V, § 15, Fla. Const.
I. FACTS
The Florida Bar filed a complaint against attorney David S. Shankman, primarily alleging misconduct in connection with Shankman’s dealings with his former law firm. After the final hearing, the referee issued a report which is summarized below.
In March 1997, Shankman left his position as an associate at an existing law firm in order to join three other attorneys to form their own firm, Newman, LeVine, Metzler, and Shankman, P.A. (the Newman firm). Shankman concentrated his practice in the area of employment discrimination, while the other three *381 attorneys worked in the area of workers’ compensation. To create a new labor law department, Shankman brought his paralegal, Kimberly Miller, to the Newman firm and later added an associate named Ann Snow and an administrative assistant, Marcy Zucker. In order to market its labor law department to other attorneys, the firm hosted lunches, made telephone calls, and offered to attorneys a twenty-five percent referral fee, which was set high to attract business. These actions were successful, and Shankman began receiving referrals of employment-related plaintiff cases on a contingency fee basis.
Initially, the Newman firm operated without formal written agreements between the shareholders. By late 1999, however, the firm was approximately $400,000 in debt, for which the partners were equally and severally liable. Shank-man and Debra Metzler sought legal advice as to their options with the partnership and were advised that they should negotiate a compromise. At this time, Shankman’s practice had begun to generate fees, and he was concerned that he would pay for more than his fair share of the debt. Shankman suggested that each shareholder should pay his or her own costs and expenses and keep the surplus fees generated. The three other partners proposed that each shareholder should be responsible for the costs associated with that shareholder’s legal practice and that surplus revenue from each shareholder would either be applied to the shareholder’s proportionate share of the debt or would be distributed by the firm to the shareholder. In December 1999, the firm adopted the shareholder’s agreement, which Shankman did not sign.[1] Around the same time, Shankman put a bonus plan into effect for his department, promising Ann Snow twenty percent, Kim Miller seven percent, and Marcy Zucker three percent of the fees generated in excess of his overhead. Shankman admits that he improperly shared fees with nonlawyers as a result of his bonus plan. On approximately March 31, 2000, Shankman, Miller, and Snow left the firm to join another law firm.
In June of 1997, the Newman firm began its representation of Dale Hatmaker, a case which was referred to the firm by attorney William McAnnally in return for a twenty-five percent referral fee. The case settled by mediation in February of 2000 for $195,000. The firm agreed to reduce its fee by $38,000 after Shankman told the Newman firm that this was necessary for Hatmaker to accept the settlement. The Newman firm also negotiated a reduced contingency fee of $5000 to the referring attorney. Accordingly, the settlement was accepted, with $150,000 to be distributed to Hatmaker, $40,000 to the Newman firm as its fee, and $5,000 in costs.[2] After Hatmaker received his check, Shankman accompanied him to the bank to introduce him to investment personnel because Hatmaker was not experienced with handling such a large sum of money. While there, Hatmaker gave Shankman $20,000 in cash as a bonus, which Shankman accepted. He then put the cash in the ceiling of his apartment for his personal use. Shankman was advised to report the cash on his income tax return. The referee found that the money *382 was clearly given to Shankman as a result of his representation since Shankman and Hatmaker did not have a prior relationship and the money received was directly related to the settlement. Moreover, this money was never voluntarily disclosed to the Newman firm’s shareholders or to Shank-man’s associate, Snow, who was entitled to a percentage of the profits that were generated. The referee found that the Bar proved Shankman had an obligation to inform his firm and his employees as to the additional funds he received at the time of the settlement.
Shankman attempted to defend his actions, contending that it was an unexpected gift from Hatmaker, who was so happy with Shankman’s performance that Hat-maker did not intend for anyone else to share in the gift. Although the referee noted that Hatmaker confirmed these facts, the referee found that under such circumstances, Shankman should not have accepted the gift. In his report, the referee specifically stated: “Obviously to accept such a large portion of his client’s funds, [Shankman] took unfair advantage of a vulnerable, emotional person, dependent upon [Shankman] for advice and trust in a fiduciary relationship.”
While at the Newman firm, Shankman also undertook the representation of Patricia Kaptzan, a woman who had been denied unemployment benefits after her employment was terminated. Shankman and other firm employees investigated her claim and began to prepare for a formal hearing in order to secure her unemployment benefits. Shankman paid Snow twenty percent of the first installment check relating to this case and paid Miller seven percent, even though Miller was not a lawyer. Prior to leaving the firm, Shankman and other employees also discovered that there was a potential whistle-blower action against Kaptzan’s former employer. However, Shankman did not disclose this information to his fellow partners and instead directed that Kaptzan’s cost account be closed out and a refund made to the client. After Shankman left the firm, he continued to contact Kaptzan and settled the matter after he became associated with his subsequent law firm. Shankman also took five other clients without full disclosure to the firm. As the referee noted in his report, this was not the result of any oversight or mistake but was a calculated effort by Shankman “to remove as many assets as possible from that firm for himself.”
At the time, Shankman was concerned with the ongoing joint $400,000 debt and financial obligations for rent and other overhead expenses that had not been resolved. The referee specifically found that Shankman’s failure to disclose the Kaptzan matter in addition to the five other clients was “a willful act that shows his intent for self-help in the ongoing dispute.” In mitigation of Shankman’s “self-help,” the referee noted that other shareholders of the Newman firm were receiving benefits from the firm, unbeknownst to Shankman, such as cars and insurance. In fact, the firm’s managing partner at that time obtained funds for his alimony payments from the firm despite the fact that the firm was unable to pay the payroll expenses that month. The referee labeled the Newman law firm as a “financial disaster,” describing the firm as follows:
This matter before the Bar seems to be driven by the initial decision by the shareholders to begin paying themselves from the firm based upon lines of credit secured by themselves and family members and drawing personal income from accounts that were not sufficient to pay the draws without exercising the lines of credit. The fear that the income expectations were unrealistic and the continu *383 ing monthly deficit brought them to a crisis point when the money was gone and the expenses continued. [Shank-man] testified that from his beginning with the firm to the crisis there had not been regular distribution of written statements, written of income and losses of the firm. No annual, semi-annual, quarterly or monthly, etc. reports to shareholders had been received.... They seemed to be unaware of the true nature of the firm expenses as opposed to income. [Shankman] had oral concessions given by the other shareholders of the fact he could receive larger sums from his cases as requested but there is no written memorandum or understanding agreement received by [Shankman],
Further, the referee found that Shank-man failed to file a timely response to a motion for summary judgment in a case that was pending before the United States District Court for the Middle District of Florida. The referee explicitly rejected Shankman’s explanation that Shankman failed to file the response because he believed the judge would strike the summary judgment motion as untimely. As the referee noted, such an explanation would still require Shankman to file a pleading which would notify the judge as to the believed deficiency. The referee found that because Shankman failed to file a timely response, his client’s claim was not heard during the appellate process and this failure prevented a timely trial of the matter. Shankman notified his other partners as to the possibility of a malpractice claim, thus accentuating the fact that Shankman realized his inaction was serious.
The referee recommended that based on the above behavior, Shankman should be found guilty of violating the following Rules Regulating the Florida Bar: rules 4-1.7(b) and 4-8.4(a), by taking cash from his client, Hatmaker; rule 4-1.8(a), by Shankman taking money from Hatmaker after the firm had agreed to a reduced fee in the Hatmaker case; rules 4-4.1(a), 4-8.4(a), and 4-8.4(c), by Shankman failing to disclose the bonus paid to Shankman; rule 4-5.4(a), by paying a seven-percent bonus to Miller, a nonlawyer; rule 4-8.4(c), by failing to inform his former firm of the fee from the active Kaptzan case, which he took with him without the firm’s knowledge along with the other five clients that were omitted from the list of clients that Shankman took; rule 4-1.3, by failing to timely file a response to a motion for summary judgment in the federal case; and rule 4 — 8.4(d), because his inaction in the federal case prejudiced the interest of his client. The referee found that three aggravating circumstances applied: (1) Shankman had a dishonest or selfish motive; (2) he engaged in a pattern of misconduct; and (3) he committed multiple offenses. As to mitigation, the referee found that Shankman demonstrated that (1) he had an absence of a prior disciplinary record; (2) he made full and free disclosure to the disciplinary board and had a cooperative attitude toward the proceedings; (3) he had a good character or reputation; (4) he had shown interim rehabilitation; and (5) he expressed remorse for his conduct. The referee further found that Shankman’s conduct was “out of character for him and was caused by the stress surrounding the firm’s financial situation.” In considering the appropriate discipline, the referee rejected the Bar’s suggestion as to a requirement of proof of rehabilitation, finding that based upon the evidence presented and his observations of Shank-man, rehabilitation proceedings were not necessary. The referee recommended instead that Shankman be suspended for ninety days, to be followed by a two-year probation with the following conditions: (1) payment of $4000 to Snow, representing twenty percent of the funds delivered *384 to Shankman by Hatmaker subsequent to the settlement; (2) a review of Shankman’s new firm’s operating account books on a random, semi-annual basis; and (3) payment of the Bar’s costs in this proceeding. The Bar filed a petition for review, contending that a ninety-day suspension followed by a two-year probation is insufficient for the amount of misconduct which the referee found.
II. ANALYSIS
As a preliminary matter, neither party challenges the referee’s findings of fact or the recommendations as to guilt. Accordingly, we approve these findings of fact and recommendations as to guilt without further discussion.
When reviewing a referee’s recommended discipline, “this Court’s scope of review is broader than that afforded to the referee’s findings of fact because this Court has the ultimate responsibility to determine the appropriate sanction.” Fla. Bar v. McFall, 863 So.2d 303, 307 (Fla.2003). As a general rule, when evaluating a referee’s recommended discipline, the Court will not second-guess a referee’s recommended discipline as long as that discipline (1) is authorized under the Florida Standards for Imposing Lawyer Sanctions (the Standards), and (2) has a reasonable basis in existing case law. Id.
While the Bar is not challenging the findings of fact, the Bar suggests that this Court should find two additional ag-gravators based on the findings of fact as they exist. First, the Bar contends that the findings of fact support the aggravating factor that Shankman involved a client in the misconduct because the client had to withhold information about the bonus he gave to Shankman. We conclude that it is an aggravating circumstance in this case that Shankman negotiated a reduced fee to be paid to the firm and to the referring lawyer but then surreptitiously received a payment himself of $20,000, which neither he nor the client disclosed to the firm and the referring lawyer who had reduced the fee.[3]
Second, the Bar contends that the findings of fact support the additional aggravating factor that Shankman caused actual harm to clients or third parties. We conclude that the referee did find that this aggravating circumstance existed by finding that Shankman should not have taken the $20,000 in cash from the client, which resulted in a thirteen-percent reduction in the money remaining for the client at the time of the bank deposit from the settlement. The referee found that Shankman took unfair advantage of a vulnerable, emotional person, who was dependent upon Shankman for advice and trust in a fiduciary relationship.
The Bar maintains that the referee’s recommended discipline is too lenient and that based on prior case law, a rehabilitative suspension of two years is warranted. In support of this assertion, the Bar relies on four cases, all of which address cases involving misappropriations: Florida Bar v. Arcia, 848 So.2d 296 (Fla.2003); Florida Bar v. Ward, 599 So.2d 650 (Fla.1992); Florida Bar v. Farver, 506 So.2d 1031 (Fla.1987); and Florida Bar v. Gillin, 484 So.2d 1218 (Fla.1986). In Arcia, this Court’s most recent announcement regarding theft from a law firm, this Court receded from its prior cases that distinguished between misappropriating funds of a client and funds of a law firm. Arcia, 848 So.2d *385 at 300. Specifically, in that case, Arda was employed as an associate at a firm and was paid a base salary plus bonuses. While still employed at the firm, Arda formed Omar J. Arda, P.A., and represented some clients for the benefit of the Arda P.A., and not the firm, thus violating his employment agreement. Id. at 29Y. He intercepted telephone calls to solicit clients, intercepted the mail to take checks made payable to the Arda P.A., and deposited fees into the Arda P.A. bank account that he had obtained in representing the firm’s clients. Arda admitted to depriving the firm of approximately $62,000 in legal fees. Id. Among other violations, the referee concluded that Arda stole firm funds and possibly client funds and recommended a three-year suspension. Id. at 298. Arda sought review, contending that this Court generally did not impose such a strict discipline for the theft of firm funds. This Court approved the three-year suspension and warned that “for purposes of attorney discipline, theft of firm funds is serious enough to warrant disbarment under most circumstances. While theft of client funds rends the fundamental bond between a lawyer and the client, theft of firm funds breaches the trust that law firms must place in their attorneys as professionals to act as representatives of the firm.” Id. at 300. We further stressed that “future cases involving theft of firm funds will carry a presumption of disbarment.” Id. Unlike the above cases, the referee in Shankman’s case did not make any findings that a theft or misappropriation of firm funds occurred.[4]
Alternatively, Shankman contends that the referee’s recommended suspension is supported by past decisions like Florida Bar v. Cox, 655 So.2d 1122 (Fla.1995). In that case, Cox violated his firm’s policy by accepting cases without the firm’s knowledge, corresponding with clients on these matters, and billing clients on firm stationery. Further, Cox requested that some of the clients make payments to him personally, rather than to the firm, and then he kept those payments. When he was initially approached by the firm about this behavior, he denied any allegations that he was “moonlighting.” Id. at 1122. In that case, this Court agreed with the referee’s recommendation that a thirty-day suspension was warranted for such misconduct. Id. at 1123; see also Fla. Bar v. Kossow, 30 Fla. L. Weekly S375, — So.2d —, 2005 WL 1175923 (Fla. May 19, 2005) (suspending attorney for thirty days based on a serious breach of his duty of loyalty to his law firm, including moonlighting).
We do not find the cases relied upon by either the Bar or Shankman to be directly analogous to this case. We conclude that the Hatmaker payment to Shankman was in violation of Shankman’s ethical obligations to the client, the firm, and the referring lawyer. After Hatmaker informed Shankman that he wanted at least $150,000, excluding fees and costs, Shankman negotiated a settlement in which the firm was told that the legal fees *386 had to be reduced in order for Hatmaker to agree to the settlement. Having made that representation, it was a clear breach of trust for Shankman to accept additional money from the settlement proceeds, particularly in light of the fact that this reduced his client’s settlement to below the threshold amount which his client informed him that he needed. We agree with the referee that this was in violation of rule 4-1.7(b), which prohibits a lawyer in representing a client when the lawyer’s professional judgment is limited by the lawyer’s own interest, and rule 4-1.8(a), which prohibits a lawyer from entering into a business transaction with a client when there is a conflict of interest with the client. Shankman further violated rule 4-8.4(c), which prohibits a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation.
Not only was Shankman dishonest with his fellow law partners regarding the $20,000 bonus, he engaged in cumulative misconduct by failing to inform his former firm of the fee from the active Kaptzan case that he took with him and in making the case appear closed. Moreover, Shank-man took five other clients with him to his new firm without informing his former partners. Shankman engaged in cumulative misconduct by instituting a bonus system where he agreed to pay a nonlawyer a seven-percent fee. Additionally, Shank-man violated rule 4-1.3 by failing to timely file a response to a motion for summary judgment in the case pending in the United States District Court.
We have considered the referee’s findings as to all of the mitigating circumstances, including the finding that Shank-man has no prior disciplinary history and the findings in respect to the financial situation of the law firm that played a clear role in Shankman’s conduct. However, based on the amount and type of misconduct which occurred, we find that this was not a momentary lapse of judgment but a pattern of dishonest and unethical conduct that occurred consistently for at least three months and involved multiple clients and other parties. As this Court has held, cumulative misconduct must be treated more severely than isolated misconduct. See Fla. Bar v. Klein, 774 So.2d 685, 691 (Fla.2000); see also Fla. Bar v. Laing, 695 So.2d 299, 304 (Fla.1997) (“[W]e find the recommended discipline [of a ninety-day suspension] to be in conflict with numerous cases wherein we imposed greater discipline due to the cumulative effect of multiple violations.... [W]e find a ninety-one day suspension appropriate for [the attorney’s] conduct.”). Accordingly, in view of the serious misconduct in receiving the $20,000 payment and the cumulative misconduct in the additional misrepresentations to his former law partners regarding the other clients he took from the firm, the division of fees with a nonlaw-yer, and the failure to timely file a response in a pending federal case, we cannot agree with the recommended discipline of a ninety-day suspension without proof of rehabilitation. We conclude that the referee’s recommendation as to a ninety-day suspension should be increased to ninety-one days, which will require Shankman to prove rehabilitation as a condition to returning to active status in The Florida Bar. In view of the increase in the suspension that requires proof of rehabilitation, we do not approve the referee’s recommendation regarding probation.
The referee further required $4000 in restitution to be paid to Snow, which represented twenty percent of the bonus that Hatmaker gave to Shankman. Just as we find that Shankman could not ethically receive this payment, we do not approve of Snow receiving any of the *387 payment.[5] We do approve the referee’s taxation of costs against Shankman.
III. CONCLUSION
Based on the above, we approve the referee’s findings of fact and recommendations as to guilt but reject the recommended discipline. David S. Shankman is hereby suspended from the practice of law for ninety-one days. The suspension will become effective thirty days from the date this opinion is filed so that Shankman can close out his practice and protect the interests of existing clients. If Shankman notifies this Court in writing that he is no longer practicing and does not need the thirty days to protect existing clients, this Court will enter an order making the suspension effective immediately. Shankman shall accept no new business from the date this opinion is filed until he is reinstated.
Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from David S. Shankman in the amount of $7,406.50, for which sum let execution issue.
It is so ordered.
PARIENTE, C.J., and WELLS, QUINCE and CANTERO, JJ., concur.
LEWIS, J., concurs in result only.
ANSTEAD, J., concurs in part and dissents in part with an opinion, in which BELL, J., concurs.

. Shankman was unhappy with this agreement because it did not address indemnity for a partner who paid off his portion of the debt. Although Shankman never signed the agreement, there was no finding that the agreement was invalid.

. Out of the proceeds of the Hatmaker case, Shankman demanded an $18,400 bonus, which he received.

. The referee recommended that Shankman pay Snow $4000, representing twenty percent of the funds delivered to Shankman by Hat-maker, based on the parties' agreement relative to bonuses.

. As addressed above, the referee found that the new agreement between the partners provided that “each shareholder would be responsible for the costs associated with that shareholder's legal practice, and that surplus revenues generated by a shareholder's practice would either be applied to the shareholder’s proportional share of debt or be distributed or paid by the Firm to the shareholder.” While Shankman failed to report the Hatmaker bonus and failed to disclose the fees in the Kaptzan case, the funds for his portion of the overhead expenses would have either been paid to him or applied to his portion of the outstanding debt. Accordingly, other than requiring Shankman to pay Snow the required bonus on her portion of the fees, the referee did not find that any other restitution was required.

. We do not address whether Hatmaker is entitled to restitution from Shankman because this issue was not presented by The Florida Bar or determined by the referee. See also Fla. Bar v. Smith, 866 So.2d 41, 49 (Fla.2004).